In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3370

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GARY VAN WAEYENBERGHE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:04-CR-87—**Allen Sharp**, *Judge.*

ARGUED SEPTEMBER 6, 2006—DECIDED MARCH 27, 2007

Before ROVNER, EVANS, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Despite the promising name—First Choice Investment Capital—First Choice should not have been the first choice for any investor. This is because it was a fraud. Set up to market earned automobile receivables (EARs) as an investment opportunity that would return 11% interest on a monthly basis, the program flourished at collecting investors' money. It did not, however, do so well at returning it. Consequently, Gary Van Waeyenberghe, the mastermind behind First Choice and at least one other investment "opportunity," was charged in a 54-count indictment with conspiracy to defraud, 18 U.S.C. § 371, mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and money laundering, 18

U.S.C. § 1957. The jury returned a verdict of guilty on all counts, and Van Waeyenberghe appeals, raising a number of issues related to his trial and sentencing.

## I.

The details of the programs Van Waeyenberghe ran are dizzying, and not particularly pertinent to the issues he raises on appeal. We thus provide only a brief overview of First Choice and another related program that formed the basis for the charges against Van Waeyenberghe. In 1999 Van Waeyenberghe incorporated First Choice Management Services in Carson City, Nevada, as an investment program purchasing automobile receivables. The premise of the program was that First Choice would own car lots, and investors would put up the capital to purchase receivables on the car loans. In theory, a car buyer would be charged between 18 and 24% interest, and 11% of that would go to the investor. First Choice would keep the remainder as profit.

Van Waeyenberghe started First Choice with the help of several other business acquaintances, most of whom later pleaded guilty and testified against Van Waeyenberghe at trial. Patrick Ballinger had previously worked with Van Waeyenberghe at a company called Yucatan Investments that sold time shares in a Cancun hotel. Dennis Weaver also worked with Van Waeyenberghe at Yucatan. Together the three of them formed First Choice. Van Waeyenberghe named himself as the President and Weaver as the Secretary. At trial Ballinger described himself as Van Waeyenberghe's "right-hand man." Because the three of them had little experience with automobile receivables, they signed a joint venture agreement with a company called Tamarack Funding that had an established automobile receivables program. Despite Tamarack's initial involvement, it left the venture in less than

two months. First Choice, however, continued to use Tamarack's materials, altering the name and other pertinent information so that it applied to First Choice.

First Choice's EAR program was remarkably successful. It was marketed by Benny Morris, who was Weaver's nephew. Morris, an experienced insurance recruiter, started a company called Integras Capital Group to market the EAR program. In return for his marketing, he received 16% of First Choice product sales.

Marketers promised investors in the program two security features. First, the investors' money would be kept in segregated Merrill Lynch accounts. By keeping the accounts segregated (or at least claiming to), First Choice avoided the licensing requirements triggered by pooled investments, which are subject to securities laws. Second, the investments would be backed by insurance policies through Lloyd's of London. Many of the former First Choice investors who testified at trial reported that they believed the EAR program would be a secure investment because of the Merrill Lynch accounts and Lloyd's of London insurance.

The EAR investments, however, were never insured by Lloyd's of London, nor did Van Waeyenberghe and his business affiliates use segregated Merrill Lynch accounts except in a handful of the numerous investments in the EAR program. Instead, the vast majority of the investors' funds were simply pooled. The money was kept primarily in an account in a bank in Michigan called Shoreline Bank. First Choice did have a Merrill Lynch general account, but it was not tied to the automobile receivables. Moreover, that account was later closed when Merrill Lynch discovered that First Choice was using its name in marketing materials without authorization. A similar account was then opened at Prudential, but it never contained segregated investor accounts.

The money was also not used to purchase automobile receivables. Van Waeyenberghe and his associates did purchase car lots—a total of 6—that were supposed to supply the automobile receivables. The lots, called Cars Across America, were run by a car salesman named Andrew Compton. But instead of buying automobile receivables, Van Waeyenberghe and Ballinger simply assigned VIN numbers to investors based on the amount of money invested in the program and the dollar amounts Compton reported from the Cars Across America car lots.

The money flowing in from the EAR program was instrumental in the second investment opportunity Van Waeyenberghe established. Called "Real Estate First Mortgages" (RFMs), it was a program based on property purchased by Van Waeyenberghe, Ballinger, and Weaver in Branson, Missouri. Using money from the EAR program, they incorporated "Forever Country Theatres" to purchase a large hotel called the Branson Inn Complex for $26 million. Van Waeyenberghe had a plan to sell fractional interests in the existing rooms at the Branson Inn or in new units that would be built as the complex was remodeled. For as little as $5,000, an investor could purchase an "interest" in the complex. In return the investor would receive a mortgage for a week at the Branson Inn, backed by an insurance policy and a recordable instrument. Investors were promised a 12% return and were also told their money would be placed in a segregated cash management account at a brokerage firm.

Like the EAR program, the RFM program was not actually insured. Moreover, the "mortgages" purchased by investors were not actually mortgages. Notably, the RFM program was taking investor money to purchase mortgages in March 2000, despite the fact that Forever Country Theaters did not close on the Branson Inn Complex until June of that year.

In July 2000, the FBI executed a search warrant at Van Waeyenberghe's home in Mishawaka, Indiana—the site where Van Waeyenberghe conducted most of First Choice's business operations. The government filed the 54-count indictment against Van Waeyenberghe in federal district court in September 2004. In the interim, Van Waeyenberghe signed a consent judgment to conclude a civil action against him by the Securities and Exchange Commission ("SEC").

At trial, a number of Van Waeyenberghe's former business partners in First Choice testified against him. Patrick Ballinger (who was on supervised release for an unrelated 2001 fraud) testified pursuant to a plea agreement entered in conjunction with charges against him and Dennis Weaver arising from the entertainment complex in Branson, Missouri. Ballinger explained his role in the EAR program and his failed attempts to acquire insurance coverage for the automobile receivables. He also described how he had taken Tamarack's materials and replaced the Tamarack name with First Choice. Andrew Compton testified under a letter of immunity about his role in receiving money from First Choice to buy automobiles for Cars Across America car lots. Benny Morris also testified about his role recruiting investors for First Choice. He testified pursuant to a plea agreement for mail fraud in connection with First Choice. Dennis Weaver also testified pursuant to a plea agreement entered on charges arising from the property in Branson. Weaver testified about the incorporation of Forever Country Theaters to buy the Branson property. Two other business associates—Ron Wanek and Perry Mullins—also testified about their respective roles. Wanek testified that he tracked the money from investors and recorded their names. Mullins testified under a grant of immunity and explained that the EAR program had too much investor money and not enough cars.

The jury found Van Waeyenberghe guilty on all counts, and the district court sentenced him to 168 months' imprisonment, two years of supervised release, and restitution of $20.9 million. Van Waeyenberghe appeals.

## II.

On appeal, Van Waeyenberghe first argues that the district court erred by failing to contemporaneously instruct the jury that the guilty pleas of the three main government witnesses were not evidence of Van Waeyenberghe's guilt. He also maintains that the court did not properly instruct the jury regarding the weight to be given the testimony of those witnesses who received letters of immunity. Because Van Waeyenberghe never requested a curative instruction following the testimony of Ballinger, Morris, Weaver, Mullins, or Compton, he must show that the district court committed plain error by failing to issue the contemporaneous instruction. Thus, Van Waeyenberghe must show that (1) the district court erred, (2) the error was plain, and (3) it affected Van Waeyenberghe's "substantial rights." *United States v. Tolliver*, 454 F.3d 660, 664 (7th Cir. 2006). If Van Waeyenberghe succeeds in demonstrating as much, we have discretion to correct the error if it " 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Trennell*, 290 F.3d 881, 887 (7th Cir. 2002)). The use of a cautionary instruction is " 'committed to the discretion of the district court, which is best situated to detect and deal with threats of unreliable testimony,'" and our review is deferential. *United States v. Jordan*, 223 F.3d 676, 692 (7th Cir. 2000) (quoting *United States v. Cook*, 102 F.3d 249, 252 (7th Cir. 1996)).

Van Waeyenberghe argues that the district court committed plain error here by failing to issue a curative

instruction immediately following each mention of the witnesses' agreements with the government. To buttress his argument that such an omission constituted plain error, Van Waeyenberghe cites a 1973 case in which we found reversible error in a district court's refusal to give any cautionary instruction whatsoever regarding an accomplice's testimony at trial. *See United States v. Wasko*, 473 F.2d 1282, 1284-85 (7th Cir. 1973). Unlike *Wasko*, however, here the district court, following Seventh Circuit Pattern Jury Instruction 3.13 (1999), *did* admonish the jury to consider the testimony in question "with caution and great care." Thus, Van Waeyenberghe's argument amounts to a dispute about the timing of the court's cautionary instruction.

Van Waeyenberghe cites no authority, nor are we aware of any, holding that a district court is required to give a cautionary instruction *immediately* following testimony that should be considered with caution. To the contrary, we noted in *Cook* that "[a]s far as we can make out, this court has never reversed a criminal conviction for *failure to give an instruction* stating that informants' testimony should be given special scrutiny." 102 F.3d at 253 (7th Cir. 1996) (emphasis added). Although *Wasko* may be the exception to this generalization, the bottom line here is that we would be hard-pressed to find any error, plain or otherwise, in a case such as this where the district court did give a cautionary instruction, just not at the precise time Van Waeyenberghe now suggests would have been preferable. The district court gave the appropriate instruction and Van Waeyenberghe was allowed to probe the credibility of those witnesses testifying pursuant to plea agreements or letters of immunity. Nothing more is necessary. *See On Lee v. United States*, 343 U.S. 747, 757 (1952) ("The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. To the

extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions."); *United States v. Heath*, 447 F.3d 535, 540 (7th Cir. 2006) (noting that decision whether to give instruction on informant's credibility problems is left to district court's discretion and reversal is required only when prejudice occurs).

Van Waeyenberghe next contends that his double jeopardy rights were violated on account of the civil action brought by the SEC. The SEC and the Department of Justice conducted parallel investigations into Van Waeyenberghe's alleged fraud. The SEC filed a complaint against Van Waeyenberghe and First Choice, and Van Waeyenberghe entered a consent decree in that action in January 2003, over a year-and-a-half before the grand jury returned the indictment with criminal charges. Under the terms of the consent decree, Van Waeyenberghe was to disgorge profits of $24.5 million plus $6.8 million in prejudgment interest and pay a $110,000 civil penalty. As part of the consent decree, Van Waeyenberghe agreed to "waive any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein."

Based on the foregoing language, the government maintains that Van Waeyenberghe waived any claim of double jeopardy; alternatively, it contends that no double jeopardy problem arises as a result of the civil settlement and later criminal charges. Van Waeyenberghe first raised the double jeopardy issue shortly before trial in a pro se motion to terminate his counsel. In that motion, Van Waeyenberghe took issue with his trial counsel's refusal to contact the attorney who had represented him during the SEC proceedings. Van Waeyenberghe claimed that this previous attorney (who was no longer representing him at the time he reached the settlement with the

SEC) had told him that he should mount a double jeopardy challenge to the eventual criminal prosecution. According to Van Waeyenberghe, his trial attorney discounted Van Waeyenberghe's claim of double jeopardy without sufficient investigation. This alleged deficiency was one of several shortcomings highlighted in Van Waeyenberghe's motion.

The district court denied Van Waeyenberghe's motion for new counsel, and rejected the double jeopardy issue in passing. The court considered the double jeopardy issue adequately covered by its own recent opinion (which it attached to its decision as an appendix) rejecting a defendant's double jeopardy challenge to a civil Federal Trade Commission action that preceded his criminal indictment. Van Waeyenberghe now asserts that the district court was obliged to hold a hearing to determine whether the purported waiver of his double jeopardy claim was voluntary and also whether the SEC penalty was civil or criminal in nature.

Waivers of constitutional rights must be knowing and voluntary. *E.g., Hartjes v. Endicott*, 456 F.3d 786, 793 (7th Cir. 2006). Van Waeyenberghe points to several cases where purported waivers of Double Jeopardy rights were held invalid to support his argument that the provision in his consent decree was not sufficiently specific to constitute a waiver of his rights. In *United States v. Hudson*, 14 F.3d 536 (10th Cir. 1994), the Tenth Circuit concluded that the language "nothing herein constitutes, nor shall Respondent contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United States . . . to bring other actions . . ." did not waive a defendant's double jeopardy rights. *Hudson* relied heavily on the fact that the language did not enumerate any specific rights or defenses being waived; rather, it simply provided that the government had not waived its right to bring other charges. *Id.* at 539. The Second Circuit reached a similar conclusion based on

language in a consent order that provided that the order did not "compromise, settle, dismiss, resolve, or in any way affect . . . any civil or criminal claims, actions, or charges against or liability of respondent . . . ." *See United States v. Morgan*, 51 F.3d 1105, 1109 (2d Cir. 1995). In both cases, the waiver was not sufficiently knowing and voluntary in part because the relevant language did not specify that the respondent was waiving double jeopardy rights.

In contrast, the provision in Van Waeyenberghe's consent decree specifies that he agrees to "waive any claim of Double Jeopardy based upon the settlement of this proceeding." Such a specific reference to Van Waeyenberghe's right to waive "any" double jeopardy claim is distinguishable from the language in the cases on which Van Waeyenberghe relies. As Van Waeyenberghe points out, however, the language also does not specifically bar double jeopardy claims in *future* criminal proceedings. Thus, although the language may be more specific than that rejected in *Morgan* and *Hudson*, it is not so crystal clear that we are willing to reject Van Waeyenberghe's challenge based on the purported waiver alone. *Cf. Walton v. Briley*, 361 F.3d 431, 433-34 (7th Cir. 2004) (noting presumption against waiver of fundamental trial rights).

Given the posture of the case, it is ultimately unnecessary to rely on the purported waiver in the consent decree. As the government points out, Van Waeyenberghe never specifically raised a double jeopardy challenge to his indictment in the district court. Instead, in the course of detailing a litany of counsel's perceived shortcomings, he expressed his frustration at counsel's refusal to raise such a challenge on his behalf. This filing is insufficient to put the double jeopardy claim itself before the district court—thus, Van Waeyenberghe has forfeited the claim. *See United States v. Hawk*, 434 F.3d 959, 962 (7th Cir. 2006) (rejecting defendant's argument that general objec-

tion in district court to recommendation in PSR was broad enough to encompass his more specific argument on appeal); *United States v. Rogers*, 382 F.3d 648, 650 (7th Cir. 2004) ("The purpose of the rules on forfeiture is to give the district court the first opportunity to correct any errors that may arise, and something as general as expressing displeasure at a longer term of supervised release does not serve that purpose."). As such, he must demonstrate plain error arising from the district court's handling of his claim. *See United States v. Schlifer*, 403 F.3d 849, 853 (7th Cir. 2005). But here again Van Waeyenberghe would be hard-pressed to demonstrate that the district court's rejection of his double jeopardy claim without a hearing was so "obvious, crucial, and egregious that we should correct it despite the absence of an objection below." *United States v. Firishchak*, 468 F.3d 1015, 1026 (7th Cir. 2006).

The Double Jeopardy Clause protects only against multiple *criminal* punishments meted out in successive proceedings. *E.g.*, *Hudson v. United States*, 522 U.S. 93, 98 (1997). The initial test of whether a punishment is civil or criminal is whether the legislature "indicated either expressly or impliedly a preference for one label or the other." *Id.* at 99 (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)). The SEC penalties on their face are civil in nature. *See* 15 U.S.C. §§ 77t(d), 78u(d)(3); *see also United States v. Polichemi*, 219 F.3d 698, 711 (7th Cir. 2000); *United States v. Perry*, 152 F.3d 900, 904 (8th Cir. 1998) ("SEC disgorgement remedies are not criminal punishments"); *United States v. Gartner*, 93 F.3d 633, 635 (9th Cir. 1996) (same); *SEC v. Bilzerian*, 29 F.3d 689, 696 (D.C. Cir. 1994) (same). Thus, Van Waeyenberghe must demonstrate that the statutory scheme is so punitive in purpose or effect that the civil remedy has been transformed into a criminal penalty. *Hudson*, 522 U.S. at 99. "'Only the clearest proof' will suffice to override legislative

intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 100 (quoting *Ward*, 448 U.S. at 249). Van Waeyenberghe has not advanced such proof here. He claims that the district court should have made such a determination by analyzing the seven factors laid out in *Hudson*.[1] But Van Waeyenberghe himself offers little to no analysis under *Hudson* as to why the injunction, disgorgement, and restitution required of him are anything other than equitable remedies that present no bar to subsequent criminal prosecution. *See S.A. Healy Co. v. Occupational Safety & Health Review Comm'n*, 138 F.3d 686, 688 (7th Cir. 1998) ("[M]oney penalties have not been viewed historically as criminal punishment."); *cf. United States v. Newman*, 144 F.3d 531, 538 (7th Cir. 1998) (observing "non-punitive character of restitution"). He does suggest cursorily that the $110,000 civil penalty was excessive. But assessing a civil penalty itself does not create a double jeopardy problem, *Helvering v. Mitchell*, 303 U.S. 391 (1938) (civil penalty for fraud does not violate Double Jeopardy Clause), and the amount at issue here falls far short of demonstrating by the clearest proof that the civil remedy is actually a criminal punishment. All of this buttresses our conclusion that the district court did not plainly err in its handling of the

---

[1] The factors are "(1) '[w]hether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a finding of *scienter*'; (4) 'whether its operation will promote the traditional aims of punishment—retribution and deterrence'; (5) 'whether the behavior to which it applies is already a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.'" *Hudson*, 522 U.S. at 99-100 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

double jeopardy claim, which Van Waeyenberghe never explicitly raised as its own issue. We therefore reject Van Waeyenberghe's challenge based on the Double Jeopardy Clause.

Van Waeyenberghe next takes issue with the district court's refusal to appoint new counsel. When a defendant has explained to the court his reasons for requesting new counsel, the court's decision to deny that request is reviewed only for abuse of discretion. *United States v. Harris*, 394 F.3d 543, 551 (7th Cir. 2005). Perhaps in an attempt to avoid this standard, Van Waeyenberghe claims that he was not allowed to explain his reasons for wanting new counsel to the district court. Van Waeyenberghe's motion requesting new counsel, however, explained in detail why he thought new counsel necessary. As recounted above, Van Waeyenberghe thought his appointed counsel should have consulted the attorney who represented him during part of the SEC proceedings. He also took issue with counsel's refusal to file a motion on Van Waeyenberghe's behalf to secure his access to the prison library, a bill of particulars, and "at least ten other motions." After reading the motion and assessing Van Waeyenberghe's reasons, the district court concluded that the request was nothing more than a tactic to delay trial. Because Van Waeyenberghe's motion laid out his reasons for desiring new counsel, we review the district court's conclusion for an abuse of discretion.

In assessing whether the district court abused its discretion, we consider the timeliness of Van Waeyenberghe's motion, the adequacy of the district court's inquiry into the motion, and whether Van Waeyenberghe's conflict with counsel effectively resulted in a total lack of communication that precluded an adequate defense. *Id.* 552. Notwithstanding an abuse of discretion, we will affirm the district court's decision unless Van Waeyenberghe can establish that he was

deprived of his Sixth Amendment right to effective assistance of counsel. *Id.* As the district court pointed out in its denial of Van Waeyenberghe's motion, it was made just weeks before trial, leading the district court to believe that Van Waeyenberghe's primary purpose was to delay trial. We are also unpersuaded that Van Waeyenberghe's conflict with his counsel amounted to a complete breakdown of communication. Although Van Waeyenberghe expressed dissatisfaction with counsel's decision not to contact Van Waeyenberghe's former counsel in the SEC proceeding and not to file all of the motions Van Waeyenberghe thought necessary, differences in strategy do not constitute grounds for new counsel. *See Woods v. McBride*, 430 F.3d 813, 827-28 (7th Cir. 2005) ("personality conflicts and disagreements over trial strategy . . . do not constitute reversible error."). Although the district court could have inquired into the motion more thoroughly by holding a hearing to question Van Waeyenberghe about the nature of his conflict with counsel, the district court's decision does not amount to abuse of discretion.

That leaves Van Waeyenberghe's challenges to his sentence. Relying on *United States v. Booker*, 543 U.S. 220 (2005), Van Waeyenberghe argues that his sentence violates his Fifth Amendment rights because the district court increased the sentence in reliance on facts not found beyond a reasonable doubt. This argument is frivolous. It is very clear in this circuit (and others) that because the Guidelines are advisory, judicial factfinding does not create a Fifth Amendment problem under *Booker*. *See*, *e.g.*, *United States v. White*, 443 F.3d 582, 592 (7th Cir. 2006).

Van Waeyenberghe's remaining challenge to his sentence fares no better. Because Van Waeyenberghe's crime was fraud, the district court began with a base offense level of six. *See* U.S.S.G. § 2X1.1(a) (1998). It then added

sixteen levels based on the loss amount. *See* U.S.S.G. § 2F.1.1(b)(1)(Q). From there the court added two more levels because the scheme had more than 600 victims, U.S.S.G. § 2F1.1(b)(2), two levels because mass marketing was involved, U.S.S.G. § 2F1.1(b)(3), two levels because the offense involved "sophisticated means," U.S.S.G. § 2F1.1(b)(5)(C), and four levels because Van Waeyenberghe organized or led five or more participants, U.S.S.G. § 3B1.1(a). Van Waeyenberghe does not suggest that the evidence did not support the upward adjustments. Instead, he claims that the cumulative effect of the adjustments renders his sentence unreasonable. Any sentence properly calculated, as Van Waeyenberghe's was, is entitled to a rebuttable presumption of reasonableness. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Van Waeyenberghe can rebut this "deferential standard" only by demonstrating that his sentence is unreasonable when measured against the sentencing factors in 18 U.S.C. § 3553. *Id.* at 608.

Van Waeyenberghe acknowledges that the district court considered the § 3553(a) factors when sentencing him, but claims cursorily that the district court did not consider that the cumulative effect of the adjustments resulted in an unreasonably high sentence. But it is Van Waeyenberghe's *conduct* that resulted in the adjustments—and none are premised on identical behavior such that impermissible double-counting is an issue. *See United States v. Schmeilski*, 408 F.3d 917, 919 (7th Cir. 2005) (recognizing that impermissible double counting occurs only when multiple adjustments are premised on "identical" facts, not when there is some factual overlap in the conduct supporting multiple upward adjustments). Here, the district court properly calculated the guideline range, and after considering the § 3553(a) factors, sentenced Van Waeyenberghe at the low end of that range. We see nothing unreasonable about the resulting 168-month

sentence Van Waeyenberghe received for his far-reach-
ing fraudulent conduct.

## III.

For the foregoing reasons, we AFFIRM Van
Waeyenberghe's convictions and sentence.

A true Copy:

     Teste:

 

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*