KANNE, Circuit Judge,
dissenting.
My colleagues in the majority concede that the trial of this case may not have been “picture-perfect,” — a whopping understatement by any measure. The majority then observes that the lack of a picture-perfect trial “is, in itself, nothing unusual.” I agree that from my experience this is a realistic proposition. There is rarely perfection in any human endeav- or — and in particular jury trials. What we expect from our judicial system is not an error free trial, but a trial process that is properly handled to achieve a fair and just result. That fair and just result was not achieved in this case.
The basis for my dissent lies not in the exceedingly drawn out evidentiary phase of this trial but in the dysfunctional jury deliberations. As to this point, the majority has taken great pains — in twenty-nine pages — to declare the flood of errors regarding the jury deliberations to be merely harmless. To understand the influences that came into play for the jurors in this case, I believe it is necessary to place various factors in overall perspective. Some of the factors would be unremarkable in a routine criminal case and other factors are totally astounding in any case. The following are highlights in summary fashion:
• In a case that was tried over a six month period, the jurors entered and exited the courthouse every day past scores of television and still cameras and reporters.
• The jurors used public elevators and brushed elbows with anyone who happened to be in them.
• Although the court’s intent was not to make the jurors’ names public, that effort was compromised when the jurors’ names were used in the in-court voir dire.
• When jury deliberations were ready to commence in the most high profile case in Chicago in recent memory, there was no thought of sequestering the jury.
• During the initial eight days of deliberations an apparent holdout juror was purportedly threatened by other jurors with a charge of bribery.
• Legal research gained by a juror from the internet was — contrary to the court’s instruction — brought into the jury room in an effort to persuade the recalcitrant juror to change her position.
• A reporter for the Chicago Tribune advised the district court during jury deliberations that the newspaper’s research had disclosed major inconsistencies between answers in a jury questionnaire and public records.
• Based on the information provided by the Chicago Tribune, the district judge, in concurrence with all parties, requested the U.S. Attorney’s Office to conduct a background check on all jurors.
• Jury deliberations were halted following the Chicago Tribune disclosure and the hiatus continued during the investigation of the jurors by the U.S. Attorney’s Office.
• During the five-day hiatus in jury deliberations, the exposé by the Chicago Tribune was published revealing that, indeed, false answers had been given on a jury questionnaire and that the sitting jurors were now under investigation.
• Amidst questions raised by the district judge concerning the necessity of advising the jurors of their constitutional rights and their right to counsel, the *706 individual examination of six sitting and three alternate jurors was begun.
• Through the judge’s examination it was determined that a majority of jurors had provided false answers under oath and could face criminal prosecution. Many jurors who were interrogated told the district judge that they were scared, intimidated or sorry for what had occurred.
• During the course of the interrogations, the jurors were granted immunity from prosecution by the U.S. Attorney.
• Some jurors later hired lawyers in order to represent their own independent interests arising from their participation in the trial.
• Two jurors who provided untruthful answers were excused from further service while others so situated were retained.
• Before the hiatus in deliberation, jurors informed the court that they were having a conflict and yet after the interrogations the judge dismissed one of the jurors in the conflict without determining whether she was a holdout juror.
• Alternate jurors were seated, but not in the order required by Rule 24.
• After eight days of deliberation by the original jury, and five days in hiatus, a reconstituted jury deliberated for ten days and returned the verdicts in this case.
To describe the circumstances surrounding the jury management and jury deliberations summarized above as “nothing unusual” is to simply turn a blind eye to the realities of what occurred — in order to save the efforts expended during a six month trial.
Having summarized the factors that played upon the jurors, I’ll now turn to an analysis of the various errors that accumulated. The errors in this case can be subdivided and analyzed in two groups. First, there is a structural error because of the jurors’ irreconcilable conflicts of interest that resulted from the jury questionnaire situation. Second, the multiple errors regarding jury management generally and jury deliberation, when viewed collectively, were so corruptive that the verdicts cannot stand.
The Jury Questionnaire Issue
Although the defendants raised issues relating to the effect of false answers to jury questionnaires and “fearful” jurors in the trial court, they did not argue those issues on appeal. Nevertheless, the matters concerning false responses to the jury questionnaires concern structural errors in the trial that are not governed by the plain error analysis provided in Rule 52(b) of the Federal Rules of Criminal Procedure.
In fact, the structural errors that exist here make this case “subject to automatic reversal” because they affect the “framework in which the trial proceeds, rather than simply an error in the trial process itself.” Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). “Such errors infect the entire trial process and necessarily render a trial fundamentally unfair. Put another way, these errors deprive the defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair.” Id. at 8-9, 119 S.Ct. 1827. “Among these basic fair trial rights that can never be treated as harmless is a defendant’s right to an impartial adjudicator, be it judge or jury.” Gomez v. United States, 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (quoting Gray v. Mississippi, 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987); Chapman v. California, 386 U.S. *707 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
As in this case, jurors take two oaths, the first requires them to answer questions truthfully in voir dire. The second requires that they faithfully perform their duties as jurors. A juror who violates either oath can face criminal prosecution. The Supreme Court has previously upheld the criminal conviction of a juror who intentionally lied during voir dire in order to gain entry onto, and then purposefully hang, the jury. Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933). Although Clark was decided almost seventy-five years ago, the prosecution of jurors for misconduct still occurs today. See generally Dyer v. Calderon, 151 F.3d 970, 973 n. 1 (9th Cir.1998) (en banc) (“We do not condone any lying by jurors; perjury is perjury.”); United States v. Colombo, 869 F.2d 149, 151 (2d Cir.1989) (noting that jurors committing criminal misconduct can be prosecuted for perjury and contempt of court and can be subject to restitution claims from the government).
The government instituted this prosecution against defendants Warner and Ryan. But, of course, the government is also responsible for investigating and prosecuting crimes involving juror misconduct. The inconsistent jury questionnaire answers given in this case could lead to criminal investigations and prosecutions.
The verdicts here were delivered by a jury whose number included some who themselves faced potential future criminal prosecution for their actions that occurred during this trial. Can sitting jurors fearing possible criminal investigations and prosecution for conduct involved in the case under consideration render valid verdicts?
In ruling on the defendants’ post-trial motions in September of 2006, the district judge dismissed the concern of allowing jurors to return verdicts in the same trial in which their conduct might subject them to criminal investigation and prosecution. She concluded that “in spite of the difficulties generated by this very lengthy, high-profile trial, these jurors were diligent and impartial.” R. 867 at pg. 65. “[I]t is implausible that the retained jurors would harbor any fears of prosecution. As for the remaining jurors, who were not specifically questioned about their questionnaires, they would have no reason to conclude that they were targets of any investigation.” Id. at pg. 87.
Can this court, as a matter of common sense, accept the district court’s factual determination that at least some jurors did not harbor fears of prosecution when they rendered their verdicts? Can the majority say that these jurors retained their capacity to render fair and impartial verdicts that can strip the defendants of their liberty and result in the defendants receiving significant prison sentences after the jurors themselves were the subject of an investigation?
In examining the district court’s decision to allow these jurors to return verdicts, that decision should be examined in the extraordinary context that had developed. After serving for six months on an extremely high profile trial with overwhelming media and public scrutiny, and eight days into the deliberations, on Thursday, March 23, 2006, the jurors’ deliberations were stopped. When they returned four days later on Monday, March 27th, the jury was not allowed to continue deliberating. Instead, six of the sitting jurors and three alternate jurors were interrogated by the district judge. They were called one-by-one into the judge’s chambers. Questions regarding inconsistent answers on the jury questionnaire form were asked. Jurors Ezell and Pavlick were ultimately dismissed, to be replaced by the two alter *708 nates. Four of the six sitting jurors were retained. The jury deliberations were stopped during this two day period and the reconstituted jury would not start the second round of deliberations until Wednesday, March 29th.
Much like children called into the principal’s office, one could imagine the strain that this inquiry placed on both the jurors who were questioned and those who remained in the jury room unquestioned. It is noteworthy that in describing her experience in examining Juror Casino, the district judge stated, “Grilling Mr. Casino is one of the most distasteful things I have done in this job.” Mar. 28, 2006 Tr. at pg. 24658, In. 25 & pg. 24659, In. 1. It is also reasonable to conclude that the jurors who were called into the judge’s chambers began discussing their experience with the other jurors upon return to the jury room to figure out what was going on.
Even more telling is that the district judge on March 27th recognized, along with various counsel, the specter of juror prosecution lurking in the case and the impact this would have on the trial. March 27th and 28th are key days in the case because these are the two days that the district judge considered how to handle the juror questionnaire issue and thus it is worth examining closely the record from these two days. The district judge, shortly before her examination of then-sitting Juror Ezell, recognized that the jurors faced possible criminal charges for juror misconduct when she observed:
A concern I have, beginning with Ms. Ezell, is that if we were to bring Ms. Ezell in to ask questions of her regarding her failure to disclose this arrest record that she has and other issues— for example, the apparent use of an alias — Do we have to advise her of her rights? Do we have to give her an opportunity to have counsel? Because it does seem to me that we will be asking her potentially about criminal conduct, specifically perjury in connection with her responses to the questionnaires.
Mar. 27, 2006 Tr. at pg. 24366, Ins. 16-24 (emphasis added). Prosecutor Collins added that “I do think to the extent there are consequences to a criminal prosecution [of the jurors] we would be recused from it if there was even contemplation of such a thing.” Mar. 27, 2006 Tr. at pg. 24386, Ins. 19-22.
Mr. Genson, an attorney for defendant Warner, added that his client was in a Catch-22 situation:
Certainly, when I have a client that’s charged essentially — at least that was a good deal of the closing argument — with concealing, hiding, there is charges of obstruction, false statements, the idea that I want to tell these jurors, “You have a right to a lawyer,” is ludicrous. It doesn’t help me to do that. I don’t want to do it.
On the other hand, I am suggesting to your Honor that perhaps we should. It’s not to my interest to tell these jurors, or at least in my client’s interests to tell these jurors, they need a lawyer. I mean, I don’t need to introduce all those things given the charges against my client.
But I do think it’s a valid — if something happens in this case and if some other prosecutorial body, given that Mr. Collins said that they would be recused, decides to prosecute people for false statement and we haven’t given them their rights, I mean, I just feel that — I think that’s at least an issue that your Honor has to consider.
Mar. 27, 2006 Tr. at pg. 24404, In. 25 & pg. 24405, Ins. 1-17.
The court recessed for lunch in the middle of its juror interrogation procedure on March 27th. After lunch, Mr. *709 Collins informed the parties and the court that the U.S. Attorney had granted the jurors immunity.
For the record, we did consult, your Honor, with the U.S. Attorney at the lunch break in terms of jeopardy any jurors would have going forward. And we did not address the issue in advance of Ezell and Pavlick, and I would make this of record.
Our office — [U.S. Attorney] Fitzgerald has indicated that he believes that it’s more important to get the candid information from the jurors than have them — the process chilled by them — any statements they say being used against them. And so he authorized me to make a statement that any statements these jurors make going forward would not be used against them.
Mar. 27, 2006 Tr. at pg. 24500, Ins. 16-25 & pg. 24501, Ins. 1-2 (emphasis added). Note that the immunity grant covered the jurors’ statements “going forward.” The record does not reflect whether the U.S. Attorney granted immunity to the jurors for their original conduct of their answers provided during voir dire on the questionnaire and therefore there is a potential that these jurors could still face criminal prosecution. The district court proceeded in questioning the jurors informally without an advisement of rights and without the presence of lawyers for the jurors.
Jurors who ultimately would render the verdicts now faced conflicts sufficient enough to have a federal district judge and several experienced attorneys consider whether these jurors needed to be advised of their constitutional rights. And we have an experienced prosecutor, the United States Attorney, who sees this situation as serious enough to grant immunity to the jurors. Yet these same jurors were returned to the jury room, instructed to begin anew their deliberations. The reconstituted jury ultimately rendered the verdicts in this case.
When the district judge wonders aloud whether warning jurors of their constitutional rights is required, when jurors could need their own lawyers, and when the U.S. Attorney is issuing immunity grants to jurors, it is impossible not to recognize the extraordinary nature of the case. These circumstances are not “usual” and far from the way our criminal justice system should work.
In addition, the district court’s ruling from September 2006 that “it is implausible that the ... jurors would harbor any fears of prosecution,” R. 867 at pg. 87, is not supported by the record. Although counsel was not appointed for the jurors, individual jurors would obtain private counsel in this case. Juror Pavlick had previous representation and mentioned his attorney when he was interrogated individually by the district court. Jurors Peterson and Losacco would both later inform the court that they had obtained counsel. Several of the individual jurors questioned during this period recognized that they had made inconsistent statements on the juror questionnaire and some apologized for the mistake. Other jurors specifically mentioned that they were scared or intimidated by the situation.
Furthermore, this is not a situation in which the district court can solve the problem by saying that the jurors made an honest mistake. The decision as to whether to investigate and prosecute a case is not the district court’s to make but rather the prosecutor’s decision. Additionally, the question of whether a juror incorrectly but honestly answered a question or intentionally lied to get onto a jury is a question of fact for a second jury in a future criminal proceeding.
Despite recognizing the potential of “fearful” jurors, the district court was un *710 willing to declare a mistrial. In addressing the defendants’ argument that the investigation had impacted the jurors’ ability to be fair and impartial the district court responded:
The ... argument you are making is that we now have a bunch of fearful jurors. I just don’t know how to address that.
Again, I understand that the defendants do have important interests to represent here. I have before me— nobody has called it this, but this is a motion for a mistrial at this point. If I grant this motion, these defendants are going to be tried again. I don’t — I am just — I am really wondering whether if I grant the motion for a mistrial, I am effectively saying it isn’t possible to pick a jury for this case.
Mar. 28, 2006 Tr. at pg. 24699, Ins. 16-25 & pg. 24700, In. 1 (emphasis added). The obvious — but onerous — way to address this situation was to declare a mistrial. In any event, the concern regarding the selection of a new jury should not have been á consideration. It is not difficult to understand the great pressure generated by a six month trial to reach verdicts in this case. Nevertheless, jurors in fear of prosecution for conduct involved in the case on which they are sitting should not be allowed to render verdicts, their bias is inherent.
As a matter of law, biased jurors cannot be fair and impartial. Fair and impartial jurors are required as part of the defendants’ structural protection for a fair trial and therefore the defendants are entitled to an automatic reversal of their convictions. Neder, 527 U.S. at 9, 119 S.Ct. 1827.
The majority responds that the defendants were afforded the structural protections of a fair trial before a fair and impartial jury and therefore any error relating to jury misconduct, improper influence of the jury and jury bias should be reviewed under harmless error. Maj. Op. 703-04. “The bias of a ... juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law.” United States v. Wood, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). As Chief Justice Marshall explained at the trial of Aaron Burr, there are certain situations in which a juror “may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice.” United States v. Burr, 25 F. Cas. 49, 51 (C.C.D.Va.1807). Although the “[u]se of the ‘implied bias’ doctrine is certainly the rare exception,” Hunley v. Godinez, 975 F.2d 316, 318 (7th Cir.1992) (per curiam), as we recognized in United States v. Polichemi,
The concept of implied bias is well-established in the law. Many of the rules that require excusing a juror for cause are based on implied bias, rather than actual bias. For example, a court must excuse a juror for cause if the juror is related to one of the parties in the case, or if the juror has even a tiny financial interest in the case. See, e.g., United States v. Annigoni, 96 F.3d 1132, 1138 (9th Cir.1996); Getter v. Wal-Mart Stores, 66 F.3d 1119, 1122 (10th Cir.1995). Such a juror may well be objective in fact, but the relationship is so close that the law errs on the side of caution.
219 F.3d 698, 704 (7th Cir.2000) (Wood, D., J.); see, e.g., Smith v. Phillips, 455 U.S. 209, 221-24, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O’Connor, J., concurring); Conaway v. Polk, 453 F.3d 567, 587-88 & n. 22 (4th Cir.2006) (noting that “implied bias [is] a settled constitutional principle” and providing citation to cases from ten different Circuits since 1982 recognizing the *711 continuing applicability of the implied bias doctrine); Brooks v. Dretke, 418 F.3d 430, 430-31 (5th Cir.2005) (overturning a conviction on the basis of implied jury bias when a juror faced a pending criminal charge filed by the same prosecutor’s office that was prosecuting the case on which the jury was presiding); Dyer, 151 F.3d at 984 (citing Dr. Bonham’s Case, 77 Eng. Rep. 646, 652 (C.P.1610) (tracing the lineage of the implied bias doctrine to Sir Edward Coke’s dicta in Dr. Bonham’s Case in 1610)).
A biased juror “is a juror in name only” who taints the court and the jury’s verdict making it a “mere pretense and sham.” Clark, 289 U.S. at 11, 53 S.Ct. 465. The verdicts returned by these biased jurors should be vacated because only a jury composed of fair and impartial jurors can strip the defendants of their liberty. Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
General Management of the Jury and Jury Misconduct
It is also necessary to review additional jury misconduct and the jury management decisions of the district judge. Errors of a nonstructural nature are analyzed under Federal Rule of Criminal Procedure 52, where errors raised by the defendants are reviewed under a harmless error standard and those not raised are reviewed under a plain error standard.
The majority determines that on appeal the defendants raised three specific issues about the jury: (1) that the verdict was tainted by the jurors’ use of extraneous legal materials; (2) that the dismissal of Juror Ezell was an arbitrary removal of a defense holdout, and; (3) that the substitution of jurors after deliberation had begun was prejudicial. Maj. Op. p. 674. In addition, the majority notes that the defendants have not raised on appeal the issue of the cumulative and prejudicial effect of jury misconduct and therefore that issue is not before us — although raised below. Id.
The majority correctly observes that jury management or control measures properly lie within the discretion of the district judge. Maj. Op. p. 703. Nevertheless, courts of appeal have supervisory authority in fashioning standards of criminal procedure to be followed by the district courts. Wayne R. LaFave, et al., Criminal Procedure § 1.6(i) pg. 325 (2d ed.1999).
I disagree with the narrowed scope of review advanced by the majority. What follows is a discussion of a more global look at the juror misconduct and jury management involved in this case.
Of course, as repeatedly pointed out, this court is guided by the Supreme Court’s instruction that the defendants are guaranteed a right to a “fair trial,” not a “perfect trial.” McDonough Power Equip. Inc. v. Greenwood, 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).
As to the internet research regarding the law, there is no dispute that Juror Peterson brought outside material into the jury room during deliberations while she and a number of jurors were in conflict with Juror Ezell. A number of jurors urged Juror Peterson to search the internet and bring back to the jury information on jury deliberation. Her research could be used to show Juror Ezell the “error of her ways.” This entire episode was a deliberate disregard of the admonition of the court not to bring outside legal sources into the jury room.
Juror Peterson claims that the material was an American Judicature Society article about deliberations and she had no intent to inappropriately influence Juror Ezell. Juror Ezell disputes this claim, countering that the information related to bribery and was used to threaten her so that she would vote with the other jurors. *712 Regardless, it is clear that Juror Peterson brought outside material into the jury room during the course of deliberations and used this material as part of the jurors’ efforts to convince Juror Ezell to join them in returning a verdict.
In her post-trial ruling, the district court determined that the article on jury deliberation “did not pertain to any substantive issue in the Defendants’ trial. It concerned only the process of deliberation, and the substance of the article did not contradict any instruction that this court gave to the jurors.” R. 867 at pg. 81. Errors in the jury deliberation process raise issues of law no different that errors relating to substantive matters, such as obstruction of justice. Both procedural and substantive areas of law are equally important. Moreover, a court cannot hide behind saying that the unauthorized article contained a proper statement of the law. It is axiomatic that jurors are not allowed to bring in any outside materials into deliberations regardless of whether they are a correct statement of the law. Jurors are restricted to receiving pronouncements on relevant law only from the trial judge.
The seriousness of this misconduct is demonstrated by the fact that Juror Peterson and Juror Losacco, who were involved with Juror Peterson in the conflict with Juror Ezell, both obtained private counsel to represent them on this issue. The record does not reflect whether Jurors Peterson and Losacco retained their attorneys during deliberations or after deliberations as Juror Ezell did not make a public allegation against Jurors Peterson and Losac-co until after the verdicts had been returned. However, when the district court conducted a post-verdict inquiry on this issue, both Jurors Peterson and Losacco appeared through their respective counsel.
The jurors originally sent notes informing the district court that they were in conflict. This is the conflict between Juror Ezell and several of the other jurors including Juror Peterson. Juror Peterson was instructed by several other jurors to— “do her homework” — meaning to find information on the internet which the jurors could use in a hope of convincing Juror Ezell to join their views.
However, during the period that the district judge was considering what to do about the conflict among the jurors, she was also informed about the juror questionnaire problem. Thus, the court was faced with two independent problems, the jury conflict issue and the juror questionnaire issue. Yet, the juror questionnaire issue wholly consumed the district judge’s consideration of the case at that point. The district judge left unresolved her consideration of the conflict between potential “holdout” Juror Ezell and other jurors. Nowhere in the record does the district judge make a ruling as to whether a conflict existed between Juror Ezell and the other jurors to determine if the jurors had deadlocked or if Juror Ezell was indeed a holdout. Nor did the court determine the impact that dismissing Juror Ezell would have on the other jurors in light of the conflict among the jury as expressed to the court in the jurors’ notes, and whether this might give an indication to other jurors that the court was siding with the views of one group of jurors over another. However, the district judge ultimately excused Juror Ezell based on the inconsistent statements Juror Ezell made on her questionnaire.
At the beginning of the trial, the district judge ordered the juror questionnaires to be redacted, yet she used the jurors’ names during in-court voir dire. This allowed the Chicago Tribune to obtain the jurors’ names from the transcripts of the in-court voir dire despite the fact that the court had originally placed the jurors’ names under seal. As Prosecutor Collins *713 later noted, “a trained monkey” could have matched the information together between the publicly redacted questionnaires and in-court voir dire transcripts. Mar. 27, 2006 Tr. at pg. 24591, In. 22. Because jurors’ names were “in effect” leaked to the media during the trial, the court was unable to avoid the larger issue of a juror background investigation by the media and the impact this had on the trial.
Apart from the general admonitions made by the court it appears that there was little control of the jurors’ exposure to external influences outside of the courthouse. In addition to Juror Peterson’s misconduct, the jurors continued to read newspapers and were exposed to media coverage of the trial, the jurors received inquiries from friends and family about the case, and the jurors discussed the case with outsiders while the case was pending. All of these actions were taken in violation of the court’s instructions, yet a reconstituted jury was allowed to deliberate and return verdicts.
There is often a lack of a record on key issues. The district judge participated in a discussion with the parties but did not state that she was providing a definite ruling. Thus, the record is at best inconclusive, and at the worst nonexistent, on the district court’s decisions on many of the critical issues in this case. The most striking example is the reseating of the alternate jurors. Once the district judge decided to excuse Jurors Pavlick and Ezell, the court was required, pursuant to Rule 24, to seat alternate jurors in the order in which they were selected. However, in the reseating process the district judge skipped the next juror in line, Alternate Juror Masri. We know that he was skipped but the district judge did not say why he was passed over.
The majority deduces that Alternate Juror Masri was dismissed for his failure to disclose a prior DUI. But, there is no ruling from the district judge to support the majority’s deduction. The government suggested at oral argument that Masri was excused because he received his juror certificate and was thanked for his service. But there is no record excusing him or indicating why he did not serve. Thus, the record does not demonstrate compliance with Rule 24.
At oral argument before this court, Prosecutor Collins stated that “Judge Pall-meyer is a consensus builder.” Oral Arg. at 47:18. This insightful comment is the key to understanding the non-structural juror errors. Consensus building can help in finding common ground in disputes. It can also help to expose decision makers to alternative points of view. But consensus building can have negative consequences as this case demonstrates.
Consensus building by the district judge allowed a continual round robin of discussions between the attorneys and the court especially during the critical period of March 27th and 28th when the parties and the court were addressing the juror related issues. Transcripts from this period reveal a very conscientious but irresolute judge who is willing to contribute her views and concerns to the conversation involving contested issues, but is reluctant to provide firm rulings that end the court’s consideration of those issues. The record from this period is full of conversations but lacks definitive rulings. Consensus building does not always lead to the resolution of difficult issues.
A lack of definitive rulings by the trial court presents great difficulty in a review on appeal, for appellate courts review decisions, not commentary. Importantly, the lack of a firm ruling infects the consideration of excusing potential “holdout” Juror Ezell. In her post-trial ruling, the district judge said that Juror Ezell was “removed from the jury for reasons wholly unrelated *714 to [the] conflict [occurring between the jurors] revealed in [Juror] Losacco’s note.” R. 867 at pg. 75. Yet, the district judge’s post-trial decision did not provide citation to the record on this point. In fact, a review of the record during the March 27th and 28th period shows there was absolutely no consideration of the conflict between Juror Ezell and other jurors. As noted earlier, this very serious issue was forgotten once the. court and parties were made aware of the trouble in the jurors’ questionnaire answers by the Chicago Tribune.
The district judge is charged with the management and control of the jury. In the deliberation phase this includes ensuring that the jurors properly conduct themselves, avoiding outside influences, conduct proper deliberations without juror-on-juror intimidation, and scheduling deliberation times, among others.
As noted, many of the problems that plagued the trial after the case was submitted to the jury could have been avoided through sequestration. While it was certainly impractical to sequester this jury during the trial phase, sequestration during deliberations was a viable option.
In a full sequestration, deliberating jurors are typically under control of Deputy United States Marshals who are responsible for ensuring that the jurors are secure during their deliberations, in movement to and from the courthouse and jury room, and while housed offsite until a verdict is reached. Partial sequestration works less of a hardship on jurors. Under this system the deliberating jurors assemble at a remote location and are picked up by Deputy United States Marshals, transported by van to the courthouse-and moved in a nonpublic elevator to the jury room. At the end of a days’ deliberations the process is reversed. This continues until a return of the verdict.
Despite these available options there was no apparent consideration of such sequestration even in the face of the overwhelming media presence in the courthouse, the daily media reports of courtroom activity and the jurors’ continued inability during the course of the trial to avoid media reports of the trial. The relative inconvenience to the jurors weighed against a possible mistrial makes the choice of sequestration during deliberation seem clear.
Turning again to the actual deliberations, it appears that jurors were inexplicably allowed to set their own schedule for deliberations with apparently little judicial intervention. There is undisputed evidence that the jurors separated into caucuses at times during deliberations. Perhaps most striking is the example of the division between the “healthy” and the “unhealthy” jurors. The healthy jurors exercised by running up and down internal courthouse stairs while the unhealthy jurors took smoke breaks outside the courthouse. The record does not tell us if the jurors continued separate deliberations during this period outside of the presence of the other jurors.
As noted above, I recognize that individual nonstructural errors are reviewed under either harmless error or the plain error analysis as provided in Rule 52 and we afford the district judge a level of deference. However, the nonstructural errors — in their totality — were so egregious that again a mistrial was the only permissible result. The majority’s failure to consider all of these errors cannot be ignored as we must recognize that these errors undermine the public’s confidence in the “fairness, integrity or public reputation of judicial proceedings.” United States v. Olano, 507 U.S. 725, 736-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).
*715 In the final analysis, this case was inexorably driven to a defective conclusion by the natural human desire to bring an end to the massive expenditure of time and resources occasioned by this trial — to the detriment of the defendants. Given the breadth and depth of both structural and nonstructural errors, I have no doubt that if this case had been a six-day trial, rather than a six-month trial, a mistrial would have been swiftly declared. It should have been here.
Based on either the structural errors or nonstructural errors described above concerning jury misconduct, the convictions in this case should be vacated and the case remanded for a new trial. Because the majority reaches a contrary result, I respectfully Dissent.